UNITED STATES of America, Appellee,

v.

Anthoine R. WASHINGTON, Appellant.

UNITED STATES of America, Appellee,

v.

Gordon L. ALCORN, Appellant.

Nos. 91–2497, 91–2525.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 8, 1992.

Decided Feb. 21, 1992.

Rehearing Denied April 15, 1992.

Donald R. Hoffman, Topeka, Kan. (Diana L. Melching, Kansas City, Mo., on brief), for Anthoine Washington.

Bruce R. Anderson, Kansas City, Mo. (argued), for Gordon Alcorn.

Marietta Parker, Asst. U.S. Atty. (D. Michael Green, on brief), Kansas City, Mo., for U.S.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

Anthoine R. Washington and Gordon L. Alcorn appeal from their convictions for conspiracy and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(2). We affirm.

### I.

Detectives James Sola and Randy Hopkins, members of the Drug Unit of the Kansas City, Missouri, Police Department, went to the Kansas City, Missouri, Amtrak station on the morning of November 1, 1990, to await the arrival of Amtrak Train Number 4, the eastbound passenger train from Los Angeles, California.

The detectives observed Alcorn, Washington, and another man disembark from the train. After entering the station lobby, the three men converged and had a short conversation, after which Washington and the third man left the immediate area. From the men's behavior, the detectives inferred that they were traveling together but were trying to conceal this fact. Detective Sola approached Alcorn and asked and received permission to speak with him. Sola identified himself as a police officer and told Alcorn that he spoke with many people on the eastbound train because it

originated in Los Angeles, a source city for cocaine coming into the Midwest. Sola asked for and received permission to see Alcorn's train ticket and identification. Alcorn's one-way train ticket from Los Angeles to St. Louis had been paid for in cash, and his driver's license revealed his address to be at 1951 Thoreau Street in Los Angeles. Detective Sola then asked Alcorn if he could search the handbag and suitcase he had seen Alcorn carry into the station. Alcorn gave Sola permission to search the handbag; he denied that the suitcase belonged to him. Sola found no contraband in the handbag.

Detective Sola, who had noticed Washington staring at him, approached Washington and asked to speak with him. Washington agreed. Sola asked for and received permission to see Washington's ticket and identification. Washington's one-way ticket from Los Angeles to suburban St. Louis had been paid for in cash, and his driver's license revealed his address to be at 1931 Thoreau Street in Los Angeles. Detective Sola asked Washington if he knew Alcorn and if they were traveling together. Washington answered no to both questions. Detective Sola then asked for and received permission to search Washington's luggage.

As Sola and Washington were moving to a more private area in which to search Washington's luggage, Sola saw Alcorn walking away from the area and into the underground parking garage. Sola followed Alcorn into the garage and asked him to return to the station lobby so that he could speak with him further. Alcorn agreed to do so. Before reaching the station lobby, Sola performed a pat-down search of Alcorn for weapons.

Once back inside the station lobby, Sola began his search of Washington's luggage. The search of Washington's bag revealed a gift-wrapped package, which Washington said was for a friend in St. Louis. Detective Sola asked for and received permission to open the package and discovered two

bricks of cocaine product inside. At that point, Washington was placed under arrest and given a *Miranda* warning. Detective Sola then asked Alcorn's permission to search the suitcase he had seen Alcorn carry into the station. Alcorn again denied ownership of the suitcase and said that he did not care if it was searched. Washington also denied ownership of the suitcase. Detective Sola found a similarly wrapped package containing two bricks of cocaine product in the suitcase. Alcorn was then arrested and read a *Miranda* warning.

Following a pretrial suppression hearing, the magistrate judge[1] filed findings and conclusions recommending that Washington's and Alcorn's motions to suppress evidence be denied. Following a *de novo* review of the record, the district court[2] denied the motions.

### II.

Washington contends that the district court erred in denying his motion to suppress all evidence seized by the detectives at the train station. First, Washington argues that because he was reasonably led to believe that "he was the particular focus of a narcotics investigation and was not free to go," *United States v. Nunley*, 873 F.2d 182, 184–85 (8th Cir.1989), a reasonable suspicion was required when he was initially stopped. *Terry v. Ohio*, 392 U.S. 1, 20–31, 88 S.Ct. 1868, 1879–85, 20 L.Ed.2d 889 (1968). Second, he maintains that the district court's finding of a consensual search of his luggage was clearly erroneous.

■ As to Washington's first argument, we note that a *Terry* stop is a seizure for Fourth Amendment purposes. 392 U.S. at 16, 88 S.Ct. at 1877. To determine whether a seizure has occurred, we must inquire *de novo* whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. McKines*, 933 F.2d 1412, 1415 (8th Cir.) (en

---

**1.** The Honorable John T. Maughmer, United States Magistrate Judge for the Western District of Missouri.

**2.** The Honorable Elmo B. Hunter, United States Senior District Judge for the Western District of Missouri.

banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973)).

"[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980); *see also United States v. Springer,* 946 F.2d 1012, 1015–16 (2nd Cir.1991). Thus, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him...." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). More recently, the Supreme Court has stated that

> even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required.

*Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (textual citations omitted).

■ The district court determined that detective Sola's encounter with Washington was "communication between police and citizens which involves no coercion or restraint of liberty and therefore is outside the scope of the Fourth Amendment." We agree.

Washington does not argue, nor does the record reflect, that he was physically detained or restrained in any way. Rather, detective Sola approached Washington and asked to talk with him. Washington agreed. Washington also voluntarily agreed to produce his train ticket and driver's license and to answer questions about whether he knew or was traveling with Alcorn. *See United States v. Jesus Jaime Galvan,* 953 F.2d 1098 (8th Cir.1991) (applying a similar analysis to determine whether a seizure had occurred). Accordingly, we hold that the district court did not err in finding that the encounter between Sola and Washington did not amount to a seizure. *See McKines,* 933 F.2d at 1422.

■ We turn next to Washington's argument that the district court erred in finding that he voluntarily consented to the search of his luggage. "[T]he Supreme Court has explicitly stated that the voluntariness of a person's consent to a search, which involves that person's subjective understanding, is a question of fact to be reviewed under the clearly erroneous standard." *McKines,* 933 F.2d at 1425; *see also United States v. Allison,* 619 F.2d 1254, 1264 (8th Cir.1980). We must review the totality of the circumstances to determine whether the consent was given freely, voluntarily, and without coercion. *United States v. Turpin,* 707 F.2d 332, 334 (8th Cir.1983).

Washington argues that because he may have observed Alcorn's bags being searched and because he had been connected, in detective Sola's mind, with Alcorn, nothing Washington did or said subsequent to his initial contact with the detective Sola was consensual. We do not agree. First, nothing in the record indicates that Washington actually witnessed Sola searching Alcorn's bag. We note, however, that even if Washington did observe the search of Alcorn's handbag, he would have noticed that Alcorn was allowed to walk away once the search had been completed. Second, whatever detective Sola may have been thinking is irrelevant to the issue of Washington's consent.

Having reviewed the record, we find that there is no evidence that detective Sola threatened or coerced Washington in any way. Sola asked to search Washington's luggage. Washington agreed. Sola asked for permission to open the gift-wrapped package in Washington's suitcase, and again Washington agreed. Accordingly, we hold that the district court did not err in finding that Washington consented to the search of his suitcase.

We turn next to Alcorn's contention that the district court erred by 1) ruling that

Alcorn's first encounter with detective Sola was not a seizure; and 2) admitting statements made by Alcorn after his second encounter with Sola regarding the ownership of the suitcase Sola saw him carry into the station lobby.

■ As to the first argument, Alcorn notes that Sola initially told him that he had spoken with other persons on Train Number 4 because Los Angeles is a source city for cocaine. He argues that at that point the consensual nature of their conversation ripened into a seizure because a reasonable person in Alcorn's position would not have believed he was free to leave. We disagree.

We have held that a police officer's identification of himself and statement of purpose does not, by itself, render an encounter non-consensual. *McKines*, 933 F.2d at 1417–19. Our earlier analysis with regard to Washington's contention that he was seized applies with equal force here. Accordingly, we hold that Alcorn's initial encounter with detective Sola did not constitute a seizure.

■ Second, Alcorn argues that the statements made by him after his second encounter with Sola should have been suppressed because he was seized without probable cause or a reasonable and articulable suspicion and because he was not given a *Miranda* warning.

The district court determined that the second encounter was an investigative stop that required reasonable suspicion. It found, however, that detective Sola was aware of facts that reasonably warranted a suspicion that a crime was being committed.

To comply with the Fourth Amendment, police officers conducting an investigative stop must, at a minimum, be aware of particularized objective facts which, along with all rational inferences drawn from the facts, reasonably warrant suspicion that a crime is being committed. *United States v. Jones*, 759 F.2d 633 (8th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Here, detective Sola knew that Alcorn had traveled from Los Angeles, a known source city for drugs, on a one-way ticket paid for in cash; that Alcorn and Washington lived within two blocks of each other in Los Angeles, arrived on the same train, stopped to talk with each other in the station lobby, yet denied knowing each other; and that Alcorn had denied ownership of a suitcase Sola had seen him carry into the train station. *See Jesus Jaime Galvan*, 953 F.2d at 1102–03. We hold that these facts were sufficient to create a reasonable suspicion that Washington and Alcorn were engaged in illicit activity.

■ As an alternative ground for the suppression of his statement after his second encounter with the detective, Alcorn contends that he should have received a *Miranda* warning before being asked for permission to search the suitcase. We do not agree.

The Supreme Court has stated:

Under the Fourth Amendment, ... a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.... The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestions in our opinions that *Terry* stops are subject to the dictates of *Miranda*.

*Berkemer v. McCarthy*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3149–51, 82 L.Ed.2d 317 (1984) (textual citations omitted). We have already found that detective Sola had knowledge of facts giving rise to a reasonable suspicion at the time of the second encounter. Moreover, the identity of the owner of the suitcase Sola had seen Alcorn bring into the station lobby was one of the

**564**

circumstances that provoked suspicion. Finally, we believe detective Sola's question as to the ownership of the suitcase was "reasonably related in scope to the justification" for his inquiry. Detective Sola needed to know who owned the suitcase so that he could attempt to obtain consent for its search. We therefore hold that the district court properly denied Alcorn's motion to suppress.

We have considered Alcorn's and Washington's remaining arguments, and we reject them as being without merit.

The convictions are affirmed.